Judgment reversed, and <em>venire facias de novo</em><br>awarded.

# Tissue *versus* The Baltimore and Ohio Railroad Company.

1. It is the duty of the master to know as far as it is possible to know, the character of the material, in this case dynamite, which he places in the hands of his agents, and if placing it near a railroad he was exposing servants engaged in operating the road, as well as others, to a danger to which they ought not to have been exposed, he is liable for any damages arising as a result of his negligence in this particular.

2. It is a question of fact for the jury to determine, whether it was negligence on part of the master to permit a large quantity of dynamite to be stored in such a position that an accidental explosion of it might result in death or injury to his servants.

3. While a master does not warrant the absolute safety of those whom he employs to do his work, yet he is bound to take heed that he does not, through his own want of care, expose his servants to unnecessary risks or dangers, either from the character of the tools with which he supplies them or the place in which he requires them to operate.

4. Green & Coates Street Passenger Railway Co. *v.* Bresmer, 1 Out., 103, followed.

February 12th, 1886. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.

ERROR to the Court of Common Pleas of *Somerset county:* Of July Term, 1885, No. 151.

[Tissue *v.* Baltimore and Ohio R. R. Co.]

This was an action on the case brought by Cornelia Tissue. widow, and Elizabeth Pearl Tissue, child of Charles Tissue, deceased, against the Baltimore and Ohio Railroad Company, lessee of the Pittsburgh and Connellsville Railroad, to recover damages for the death of the husband and father of the plaintiffs, alleged to have been caused by the negligence of the defendant in storing a large quantity of dynamite so near the place in which the deceased was employed as to kill him by the accidental explosion of it. The following facts appeared on the trial of the case before BAER, P. J.:

Charles Tissue was in the employ of the defendant company as a flagman on what was known as the gravel, or work train. This train was sent as occasion required to different points along the line of the railroad, between Pittsburgh and Cumberland. The men employed in the management of the train were a conductor, engineer, fireman, and as many brakemen and flagmen as were needed, and all were under the supervision of the conductor, and were subject to his orders. J. B. Donaldson was the conductor at the time of Tissue's death.

A gang of workmen, comprising twenty-five to forty men, accompanied this gravel train, and were in charge of a foreman. There was no connection between these two sets of hands, further than that the conductor would move the train where it was wanted by the foreman. The foreman, with those under him, did whatever work was to be done, such as loading stone for ballast, cleaning out ditches, repairing track, &c., while the train-men, under the conductor, did nothing but manage the train. The master of road gave orders to the foreman as to what work was to be done, and the foreman then directed the conductor to take the train to the place.

Charles Tissue had been in the employ of the company as a laborer on and off for a year or two, and in May or June, 1883, again entered the employ of the company as a flagman on this gravel train.

About August, 1883, the defendant company erected a small frame house for the storage of dynamite, near the track of the railroad, a short distance from the mouth of the east end of Brook's tunnel in Somerset county. The company was engaged in widening Brook's tunnel so that a double track could be laid, and the dynamite was used in this work. After a large amount of stone was loosened in the tunnel and lying on the track it was "mashed" with dynamite and then removed. The magazine, or dynamite house, was erected by Mr. Armstrong, who was the superintendent of the work of widening the tunnel, and he was ordered to put up the house by Mr. Yardley, who was the company's master of road. The material taken out of the tunnel was deposited near the track

some distance east of the tunnel; it was removed from the tunnel by the men who worked in the tunnel under Mr. Armstrong. Neither the train men of the gravel train nor the men under the foreman accompanying it had anything to do with the work of the tunnel, nor in the removal of the material therefrom. Some of the material taken out of the tunnel was fit for ballasting purposes, and this was being loaded on cars of the gravel train at the time of the accident.

On Sunday morning, October 28th, 1883, the gravel train was ordered to this place to load this ballast; after the cars were loaded they were to be switched off on the side track to remain there until taken by some other train to places where needed on the road. The road consists of but a single track, with switches or side tracks, and at this time the gravel train was on the main track 1800 or 2000 feet east of the tunnel, working towards the tunnel. A freight train, known as No. 67, was due there from the west at about 9 o'clock that morning, and 20 or 25 minutes before it was due Conductor Donaldson sent Tissue to the tunnel to flag it; Tissue's duties were to flag 67 as soon as he saw it, and then with his flag or hands signal the gravel train, which would then take a side track and allow 67 to pass. Tissue was seen going to the mouth of the tunnel, and from then up to the time of the explosion, he walked back and forth along the track, from the tunnel some distance eastward, but all the time in a position where he could readily discharge his duties. Meanwhile the gravel train had moved forward towards the tunnel, and was standing on a curve in the track, which, because of an embankment, made it impossible to see from the mouth of the tunnel to the train, or to parts of it, at least.

While Tissue was in the performance of this duty the dynamite in the magazine exploded, utterly destroying the building and doing other damage, and Tissue and others were killed.

Eleven hundred pounds of dynamite were in the magazine at the time, 1000 pounds of it having been put in the evening before.

So large a quantity of dynamite had not at any time previously been kept on hand. The magazine was built about 32 feet south of the main track, and the distance from the mouth of the tunnel to a point on the track opposite the dynamite house was 178 feet. Tissue was seen just before the explosion on the south side of the track, between the dynamite house and the mouth of the tunnel; after the explosion a portion of his body was found on the north side of the track, nearly opposite the place where he was last seen alive. The body was mutilated almost beyond recognition.

The main facts in the case were not in dispute. The plain-

tiff claimed that the defendant had been guilty of negligence in two particulars—in the location of the building, and in the care of the dynamite. On the first point it was shown that the country surrounding the eastern portal of the tunnel where the magazine was built was very rough, rocky, timber land—not cultivated, and no dwelling house near. The building could have been put up at a safe distance from the track where no persons would have had occasion to go, except those handling the dynamite, and then if an explosion had occurred no other lives would have been endangered. The evidence in the case shows that dynamite can be exploded by many methods, and sometimes it explodes without any apparent cause. It was also shown that what would at one time be considered certain to explode it would at another time utterly fail to do so. Because of this uncertainty, and because of the dangerous and destructive character of dynamite, plaintiff claimed that it was the duty of the company to have erected the building, if such building was necessary, at a place remote from where its employés were working. It was shown that, after the explosion, the company erected a new magazine some distance away, about 300 feet, and back of the mouth of the tunnel, where there would be no probable danger to employés. This fact plaintiff claimed was not only a precautionary move on part of the defendant to prevent future disasters, but was also proof and an admission of negligence in locating the first house. On the question of the care used in handling the dynamite, the character of the building was shown—that it was a very small one ; that a large quantity of dynamite, 1100 pounds, was stored in it ; that a stove was in the building with fire in it at a time no dynamite was being used ; and there was evidence that the building had no flue or chimney, but that the stove pipe protruded through the roof ; and these, with the other facts in the case, plaintiff claimed were sufficient to establish what was claimed on part of the plaintiff.

The court directed the jury to render· their verdict for the defendant in the following charge :

In the case on hand the counsellors, both for the plaintiff and for the defendant, have ably argued the law involved and have submitted points, one of the points submitted by the counsel for the defendant being as follows :

" Under all the evidence in this case the verdict must be for the defendant."

This point we have· to meet. As we view the law at present, from all the facts in evidence in this case we feel it our duty to say to you that the verdict, on all the evidence in the case, must be for the defendant ; and so you will return your verdict.

The verdict was for the defendant and judgment thereon, whereupon the plaintiff took this writ, assigning for error the charge of the court.

*Coffroth & Ruppel* (*Valentine Hay* and *John R. Scott* with them) for plaintiff in error.

1. The court erred in directing a verdict for the defendant.

It is needless to spend much time in showing that it was the province of the jury to pass upon these questions: (1) contributory negligence if there was any evidence thereof; (2) whether the risk was an ordinary one and incident to the business: Hough *v.* Ry. Co., 10 Otto, 213; (3) whether the danger was such as was apparent: Price on Railroads, page 381; Wharton on Neg. sec., 217; (4) whether Tissue acted as a reasonably prudent man would have done: Wood on Masters and Servant, sec. 387.

If the plaintiff's evidence showed negligence on the part of the company without fault on the part of Tissue, then the *onus probandi* was on the defendant to establish such facts as would relieve it from the consequences of its negligence.

2. The defendant was responsible for the risk of damage from the storage of the dynamite. The presumption that he assumed the risks, if given its full force, can only be extended to cover the probable risks incident to the service: Wood on Master and Servant, sec. 385. "If the master has, by his own personal negligence or malfeasance, enhanced the risk to which the servant is exposed beyond those natural risks of the employment which must be presumed to have been in contemplation when the employment was accepted, as for instance, by knowingly employing incompetent servants, or defective machinery, or the like, no defence founded on this principle can apply, for the servant does not, as an implied part of his contract, take upon himself any other risks than those naturally incident to the employment": Wharton on Neg., sec. 207. For the plaintiff did not take upon himself any risks except such as are ordinarily incident to the business in which he was engaged: Baird *v.* Petit, 20 P. F. S., 482; Green & Coates St. Pass. Ry. Co. *v.* Bresmer, 1 Out., 103. But it is equally implied in the same contract that the master shall supply the physical means and agencies for the conduct of his business. It is also implied, and public policy requires, that in selecting such means he shall not be wanting in proper care. His negligence in that regard is not a hazard usually or necessarily attendant upon the business. Nor is it one which the servant, in legal contemplation, is presumed to risk: Hough *v.* Ry. Co., 10 Otto, 218. The company was responsible for what might, in the nature of things, occur from its neglect,

and its responsibility was not limited by what its officers may have thought to be improbable or even impossible: Oil City Gas Co. *v.* Robinson, 3 Out., 6.

3. Even if Tissue were guilty of negligence, which he was not, if his negligence did not contribute to or cause the accident, it is in defence. The negligence which caused the explosion was the negligence of the company, and the rights of the plaintiff here are the same as if Tissue had not been in the employ of the company. There is no difference between liability to a stranger and to a servant for a man's own negligence or want of skill: Ardesco Oil Co. *v.* Gilson, 13 P. F. S., 151. The company cannot excuse itself from the consequences of its negligence even if Tissue had no right to be where he was when the explosion occurred. In Gray *v.* Scott, 16 Id., 345, the plaintiff's son, at the time he was killed, was at a place where no duty called him, it was a place of danger, and he had frequently been warned away from there, and yet it was held that the plaintiffs could recover. In Penna. R. R. Co. *v.* Lewis, *et ux.*, 29 Id., 33, plaintiffs recovered for the death of their son through the negligence of the company, although the son was a trespasser on the road at the time. It is clear a plaintiff may recover, though he did not use due care, if his negligence in nowise caused the accident resulting in his injury: Pass. Ry. Co. *v.* Boudrou, 11 Norris, 480; Creed *v.* Penna. R. R. Co., 5 Norris, 145.

*W. H. Koontz*, for defendant in error.—The court did not commit error in directing a verdict for the defendant. The case turned upon the point that Tissue had been at that point frequently before the accident happened; that he knew the house was built for the storage of dynamite; knew that dynamite was stored there; was acquainted with its qualities; had used it in blasting rock, etc., and that he remained in the employment of the company after such knowledge, and consequently took the risk of the service.

It is well settled that a railroad company is not an insurer of the lives of its servants, and "is bound to take ordinary and not extraordinary care for the safety of its servants": Louisville, etc., R. R. Co. *v.* McCay, 15 Am. & Eng. R. R. Cases, 281; Wharton on Negligence, 206; Sykes *v.* Packer, 11 W. N. C., 494.

It now remains to apply the well settled rules of law to this case. "When an employment is accompanied with risks of which those who enter into it have notice, they cannot, if they are injured by exposure to such risks, recover compensation from their employer": Wharton on Negligence, 200–217; Mansfield Coal Co. *v.* McEnery, 91 Pa. St. R., 194; Green &

Coates St. P. R. R. v. Bresmer, 97 Pa. St. R., 103 ; Sykes v. Packer, 99 Pa. St. R., 465.

"By continuing in the master's service after being fully apprised of its dangerous character, the servant takes upon himself all risks incident to such service ": Umback v. Lake Shore, etc., R. R. Co., Am. & Eng. R. R. C., Vol. 8, page 100. See also Houston & Texas Central Ry. Co. v. Meyers, Id., 114 ; Sweeny v. Central Pacific R. R. Co., Id., 153 ; De Forest v. Jewett, Id., 498 ; Houston, etc., R. R. Co. v. Fowler, Id., 507 ; Citing Thompson on Negligence, Vol. 2, 976, 1008, sec. 7 ; Pierce on Railroads, 378, 379, 380.

"The general principle is that when a servant enters into the employment of another he assumes all the risks ordinarily incident to the business, and as between himself and the master he is supposed to have contracted on those terms ": Wood on Master and Servant, sec. 326. Another principle is : when the servant has equal knowledge with the master of the danger incident to the work, he takes the risk upon himself if he goes on with it : Id., sec. 349, 355, etc., cited in Galveston, etc., R. R. v. Lempe, 11 Am. & Eng. R. R. C., 204.

Mr. Justice GORDON delivered the opinion of the court, March 29th, 1886.

The dynamite magazine, from the explosion of which Tissue lost his life, was placed in the position which it occupied by the direction of Thomas D. Armstrong, who filled the position of superintendant of the work at the tunnel, and in this he acted under the instructions of Mr. Yardly, the master of the road. This act, then, so far as it concerned subordinate employés, was by the corporation itself, and cannot be attributed to any of the fellow servants of the deceased : Frazer v. The Pennsylvania Railroad Co., 2 Wr., 102 ; Patterson v. Pittsburgh & Connellsville R. R. Co., 76 Pa. St. Rep., 389. As it is impossible to tell what was the immediate cause of the explosion, it would be by no means fair to charge it to the negligence of any one. Nor was Tissue in any way connected with the magazine, or with the work for which it was used ; he was a flagman on the gravel train, and with that train and its hands, Armstrong, the superintendent of the tunnel work, had, according to his own testimony, nothing to do. This, however, we do not regard as a material point in the case, for the determination of the issue rests not upon the resolution of the question whether Tissue was or was not a co-employé with those working in or about the tunnel, since the disaster, as we have seen, did not result, so far as is known, from the negligence of any one. The inquiry is rather as to the negligence of the company in permitting so great a quantity of dynamite

[Tissue *v.* Baltimore and Ohio R. R. Co.]

to be placed in such a position that an accidental explosion of it might result in death or injury to its servants.

Whilst it is true that the master does not warrant the absolute safety of those whom he employs to do his work, yet, as we held in the case of The Green & Coates Streets Passenger Railway Co. *v.* Bresmer, 1 Out., 103, he is bound to take heed that he does not through his own want of care expose his servant to unnecessary risks or dangers, either from the character of the tools with which he supplies him, or the place in which he requires him to operate. As the question growing out of what is here stated is one of fact it can only be determined by the verdict of a jury. Ought the company's superintendent to have known that in placing the magazine where it was placed he was exposing the men engaged in operating the road, as well as others, to a danger to which they ought not to have been exposed? The question is not whether he did have knowledge of the peculiar properties of the material which he was intrusted to handle, for his ignorance in this particular would be no excuse for the company, but whether the agent thus intrusted ought to have been one who knew that dynamite was, from its nature, liable to accidental explosions such as could not be ordinarily foreseen or provided against. We would, indeed, be unwilling to assume that either Yardley or Armstrong knew that he was subjecting these laboring men to a danger so frightful. They may, like the men themselves, have entertained the common idea, that dynamite could not be exploded but by the ordinary method of percussion. But, as we have said, this ignorance, if ignorance it was, will not excuse the company, for there was a duty resting upon it to know, as far as it was possible to know, the character of the material which it placed in the hands of its agents. In this we are not to be understood as pronouncing upon the chemical characteristics of dynamite, for about it we know little or nothing, or as charging negligence on the company or its agents. The act of putting the magazine where it was may have been prudent, or at least not unreasonably imprudent, and the explosion may have been the result of an accident which no ordinary human foresight could provide against, hence, one for which no one can be held responsible. But however this may be, the matter is, under all the evidence, for a jury, and to a jury it must be referred.

The judgment is reversed, and a new *venire* ordered.

GREEN, J., dissented.