90 193
18ap522

DANIEL CROWELL, as Administrator, etc., of ELIZABETH CROWELL, Deceased, Plaintiff, *v.* HOWARD THOMAS, Defendant.

*Master and servant — duty and liability of the master — question of negligence for the jury.*

Although the master does not warrant the absolute safety of an employee, yet he is bound to take heed that he does not, through his own want of care, expose his servant to unnecessary risks or danger either from the character of the tools with which he supplies him or of the place in which he requires him to work. The master is liable for an injury to a servant caused by the concurrent negligence of the master and a fellow-servant.

Upon the trial of an action brought to recover damages resulting from the death of the plaintiff's intestate by reason of the alleged negligence of the defendant, it appeared that the deceased, a girl, was working in a fruit-canning factory in a room where there was an ordinary barrel placed upon a table and used to hold hot and cold water; that a steam pipe and a cold water pipe entered the barrel

at the top; that the steam pipe connected directly with a steam boiler; that there was no steam gauge; that on the top of the barrel and behind the two pipes there was a vent pipe which constituted the only means of escape for the steam in the barrel, but that at the time of the accident a plug had been inserted in the vent pipe to prevent the escape of water which would otherwise be forced out by the pressure of steam; that while the barrel was in charge of the general superintendent of the establishment, instead of the employee who usually attended to it, it exploded and killed the girl who had been directed by the superintendent to draw hot water from the barrel, although such drawing of water did not appear to be any part of her duty.

There was evidence tending to show that, with the pressure in the boiler at the time of the accident, the consequent pressure in the barrel was far beyond its strength.

*Held,* that the question of the defendant's negligence should have been submitted to the jury, and that it was erroneous to dismiss the complaint.

MOTION by the plaintiff, Daniel Crowell, as administrator, etc., of Elizabeth Crowell, deceased, for a new trial upon a case containing exceptions ordered to be heard at the General Term in the first instance upon a dismissal of the complaint directed by the court after a trial at the Monroe Circuit before the court and a jury on the 11th day of December, 1895.

*Charles Van Voorhis,* for the plaintiff.

*Walter S. Hubbell,* for the defendant.

WARD, J.:

The deceased, Elizabeth Crowell, a girl of eighteen years of age, was employed in the canning factory of the defendant in the village of Fairport, Monroe county, in the summer of 1892. She had worked in the factory the year before a short time, earning one dollar and twenty-five cents. In June, 1892, she worked a couple of weeks and again about a week before the ninth of August, at which time she was fatally scalded in consequence of an explosion of a barrel in the factory caused by steam. The business of the factory was canning fruit of various kinds. The duties of the deceased were to work at a table, handle, cleanse the fruit, pour syrup upon it and assist in the canning. The barrel referred to was stationed in a large room where the girls and women employed in the factory were at work. It was placed upon a table and the top of the barrel was about seven feet from the floor. It was an ordinary barrel with iron hoops and not made specially for the purpose

for which it was used. From this barrel hot and cold water were taken for the use of the factory in canning the fruit as needed. The water was taken from an ordinary faucet in the lower part of the barrel. Two pipes were connected with this barrel, one a cold-water pipe and the other a steam pipe. These pipes entered the barrel from the top, and in each pipe at a point just above the head of the barrel was a valve by means of which the water or steam could be turned on or shut off. The steam pipe where it entered the barrel was a three-quarter-inch pipe. On the top of the barrel and behind the two pipes was a vent pipe an inch in diameter which extended above the top of the barrel five or six inches. It was put there to allow the steam to escape from the barrel. The steam from the steam pipe communicated directly with the water in the barrel. There was no steam gauge at the barrel so that one could tell how many pounds of steam pressure there was on the barrel, and the only means of escape of steam was through the pipe above specified. An expert witness testified in effect that this barrel would hold about fifteen pounds to the square inch before bursting. The fireman of the factory testified that, at the time of the accident, he had on about seventy pounds of steam. The steam pipe to the barrel was attached to a main pipe or feeder that conveyed the steam directly from the boiler. The expert testified as follows: " Q. Can you tell this jury how much pressure a common whiskey barrel will hold of steam before it will burst; how much to the square inch? A. I shouldn't think it would exceed fifteen pounds. Q. Will you tell the jury on a common whiskey barrel what the pressure would be of 70 pounds of steam to the square inch coming from a steam boiler? A. About fifteen tons. * * * The Court.— Q. Will it be the same to the square inch on the barrel as it is in the boiler? A. Yes, sir."

James Burlingame was the defendant's superintendent at the factory, having full charge of the same, employing and discharging the workmen and directing the whole operations of the factory, and there was evidence upon which the jury could find that in the management of the factory he was the *alter ego* of the defendant. He had had charge of it for several years; had been the owner of it prior to the ownership of it by the defendant; he was daily on duty at the factory and appeared to be entirely familiar with its opera-

tion; his brother, Llewellyn Burlingame, was an employee in the factory and his principal duty was to take charge of this barrel, manipulate the steam connected with it and take the water from it as needed. One witness says the girls and women did not draw the water from the faucet; "Llewellyn used to do that mostly. He most always attended the barrel. I never saw any woman draw the hot water through that faucet before. That wasn't our business." This was said with reference to the fact of the deceased drawing the hot water on that morning, to which we shall refer hereafter. The evidence does not disclose that prior to the morning of the accident the deceased had anything to do with the barrel or had any acquaintance with its use or how the steam was communicated to or operated in the barrrel, or what protection there existed against accident from the use of steam in the barrel. The steam had not been used in this barrel until the morning of the accident that season, except early in July on one occasion, and the evidence tended to show that the deceased had no knowledge in regard to that transaction. The engineer of the factory and the brother having charge of the barrel had discovered that the cold water ran out of the escape pipe on account of the pressure, and to obviate this difficulty the engineer whittled out a plug to fill this escape pipe, and inserted the plug in the pipe about the nineteenth of July. This plug extended above the top of the pipe four or five inches. One witness swears that he saw the plug in the pipe a week or two before the accident. Another witness swears that while standing on the floor you could plainly see the plug; that it extended above the barrel so that you could see it plainly. Another witness testified that before the plug was put in, cold water that was forced out by the pressure could be plainly seen, and also it could be seen that the water was not forced out after the plug was put in. The engineer testified that he cautioned Llewellyn Burlingame not to permit the plug to be in the pipe when the steam was put in the barrel. After the explosion of the barrel and the injury to the deceased, the plug was found in the escape pipe, establishing the fact that at the time of the explosion there was no escape of the steam that was being forced into this barrel. On the morning of the accident, and before the deceased went to work, and while Llewellyn Burlingame was at the barrel, the superintendent

appeared and directed him to go up stairs and attend to other business, *saying that he would attend to the barrel.* The superintendent himself turned the steam into the barrel and directed the deceased to attend to the faucet and take the hot water to the table as needed. She obeyed and was engaged in this work when the explosion occurred that destroyed her life. The head of the barrel blew out and she was scalded to death. There was no coil or pipe passing through the cold water in the barrel through which the steam could pass, a familiar contrivance for heating water. No caution was administered to the deceased by the superintendent as to any risk or danger in her working around this barrel and operating this faucet. A very slight inspection of the barrel would have enabled the superintendent to have seen when he turned the steam into the barrel and directed the deceased to do this work, that the vent hole was closed by this plug, and that there was no escape for the steam that was being put into this weak vessel, and it was for the jury to determine from the whole evidence whether he had not been guilty of negligence under the circumstances. The law governing such cases is well stated in *Tissue* v. *The Baltimore & Ohio R. R. Co.* (reported in 33 Alb. L. J. 284) by the Supreme Court of Pennsylvania as follows : " Whilst it is true that the master does not warrant the absolute safety of those whom he employs to do his work, yet * * * he is bound to take heed that he does not through his own want of care expose his servant to unnecessary risks or dangers either from the character of the tools with which he supplies him or the *place* in which he requires him to operate." (See *Bailey* v. *The Rome, Watertown & Ogdensburg R. R. Co.*, 139 N. Y. 302.) There was evidence to go to the jury upon the question whether the defendant, through his superintendent, did not understand the whole situation ; the amount of steam that was liable to be forced into this barrel ; the capacity of the barrel to withstand it ; the means of escape, if any ; whether any inspection was made of the barrel before putting the steam into it and putting the deceased at work there ; whether it was not the duty of the superintendent to make such inspection ; whether he was not negligent in having failed to do so.

The learned counsel for the defendant insists that while the cause of the explosion was negligence, it was in consequence of the negligence of the engineer and of the brother, who were

co-servants with the deceased. The difficulty with that contention is that the superintendent superseded the brother, took charge of the barrel himself, directed the deceased in her work, and was for the time being in charge of the cause of the accident. It was the superintendent who provided the unsafe and dangerous place for the deceased to work without giving her notice of her danger. Even if the negligence of the co-employees contributed to this accident it was done in conjunction with the negligence of the defendant himself, through his *alter ego,* and without which the accident would not have occurred. The defendant is, therefore, as liable as though he were the sole cause of the accident. (*Cone* v. *The Delaware, Lackawanna & Western Railroad Co.,* 81 N. Y. 206 ; *Booth* v. *Boston & Albany Ry. Co.,* 73 id. 38 ; *Brehm* v. *The Great Western R. R. Co.,* 34 Barb. 256 ; Shearman & Redfield on Negligence, § 10.)

A master is liable for an injury to a servant caused by the concurrent negligence of the master and a fellow-servant. (*De Weese* v. *Meramec Iron Co.,* [Mo. Sup.] 31 S. W. Rep. 110.)

The exceptions taken at the trial bring up the question here considered. We are of the opinion that the case should have gone to the jury upon the question of the defendant's negligence.

A new trial should, therefore, be granted, with costs to abide event.

LEWIS, BRADLEY and DAVY, JJ., concurred.

Motion for new trial granted, costs to abide the event.