O'BRIEN, RESPONDENT, v. CORRA-ROCK ISLAND MIN. CO., APPELLANT.

(No. 2,746.)

(Submitted December 15, 1909. Decided December 24, 1909.)

[105 Pac. 724.]

*Personal Injuries—Master and Servant—Mines and Mining— Explosives — Negligence — Fellow-servants — Pleading—Evidence—Hearsay—Assumption of Risk—Instructions—Promulgation and Enforcement of Rules.*

Issues—Proof—Complaint—Amendment.

1. Where evidence, though not strictly within the issues made by the pleadings, is admitted without objection, the complaint will be treated, on appeal, as if it had been amended so as to make its admission proper.

Personal Injuries—Negligence of Fellow-servants—Pleading.

2. The defense that a personal injury was brought about by the negligence of plaintiff's fellow-servants must be pleaded.

Same—Mines—Explosions—Evidence—Hearsay.

3. Where a witness in an action to recover damages for the death of a workman in a mine, alleged to have been caused by defendant company's negligence in storing a large quantity of explosives in the workings, had testified that he had seen five or six boxes of powder in the magazine a few minutes before the explosion and that two boxes were there all that day, that he had himself hauled four boxes there, but did not know who had taken them off the car and

put them in the magazine, his further statement that "it must have been the loaders; they told me there were four boxes," cannot be said to have rendered his testimony that he hauled four boxes to the magazine inadmissible as hearsay as depending for its truth or falsity upon the veracity of the loaders, but would seem to have been given as lending emphasis to his statement rather than indicating the source of his knowledge.

Same—Mines—Duty of Master—Safe Place to Work.

4. A mining company must use reasonable care to provide its employees with a reasonably safe place in which to work, due regard being had to the nature and place of the employment and the agencies used in its operations.

Same—Mines—Safe Place to Work—Jury Question.

5. *Held*, that the question whether defendant mining company, under all the circumstances disclosed by the evidence, exercised reasonable care to provide decedent with a safe place in which to work, was one for the jury to decide.

Same—Mines—Explosions—Proximate Cause—Liability of Master.

6. If defendant company was guilty of negligence in storing dynamite in dangerous quantities in the workings of its mine, and knew or, by the exercise of ordinary care, ought to have known that caps (a high explosive) were being kept with it, and but for such negligence the accident would not have occurred, it could not escape liability on the ground that there was not any evidence as to the immediate cause of the explosion, the deceased not having in any manner contributed to causing it; therefore an instruction that verdict should be for defendant in case the jury should be unable to find such cause was properly refused.

Same—Fellow-servants—Liability of Master.

7. Under the conditions set forth in paragraph 6 above, defendant would be liable even though the negligence of a fellow-servant of deceased had brought about the explosion, or if the cause thereof could not be attributed to the negligence of anyone.

Same—Assumption and Appreciation of Risk—Improper Instruction.

8. An instruction on the assumption of risk, which ignored the element of appreciation of the risk by decedent, a laborer unaccustomed to handling explosives and whose duties did not call him near a magazine in a mine, the powder stored in which exploded and killed him while working some forty feet away, was properly refused.

Same—Master and Servant—Rules—Promulgation and Enforcement.

9. Defendant company's duty toward its servants was not fully discharged by the mere promulgation of a rule against the keeping of dynamite and caps together; it was also under obligation to see that the rule was faithfully obeyed.

Same—Master and Servant—Rules—Enforcement—Jury Question.

10. The question whether defendant mining company in the exercise of ordinary care ought to have known that its rule against the keeping of powder and caps together was not being observed, was one for the jury, where the evidence showed that for a month or more prior to an explosion by which plaintiff's intestate was killed there had been a flagrant disregard of such rule.

*Appeal from District Court, Silver Bow County; Geo. M. Bourquin, Judge.*

ACTION by John T. O'Brien, as administrator of Daniel O'Brien, deceased, against the Corra-Rock Island Mining Company and others. From a judgment for plaintiff against defendant named, and from an order denying a motion for new trial, the defendant company appeals. Affirmed.

*Messrs. Gunn & Rasch,* and *Mr. Chas. R. Leonard,* submitted a brief in behalf of Appellant. *Mr. Carl Rasch* argued the cause orally.

This action is based upon the alleged negligence of the defendant company in negligently and wrongfully storing and keeping a large and dangerous quantity of dynamite on the 1500-foot level. But there is no evidence to support such allegation, and the trial court should have directed the jury to return a verdict for defendant. (*Kleebauer* v. *Western Fuse & Ex. Co.,* 138 Cal. 497, 94 Am. St. Rep. 62, 71 Pac. 617, 60 L. R. A. 381; *Tuckashinsky* v. *Lehigh & W. Coal Co.,* 199 Pa. 515, 49 Atl. 309; *Sowers* v. *McManus,* 214 Pa. 244, 63 Atl. 601.)

The deceased was fully aware of the conditions that existed, and he must be held to have assumed the risk incident to working in the place he did. (*Henderson* v. *Williams,* 66 N. H. 405, 23 Atl. 366; *Murch* v. *Thomas Nelson Sons & Co.,* 168 Mass. 408, 47 N. E. 111.)

Obedience to the rules and regulations provided by the master for the safety of his employees is a matter, says the New York court of appeals, "of executive detail which neither the corporation nor any general agent of it can personally oversee, but as to which employees must be relied upon." (*Rose* v. *Boston & A. R. R. Co.,* 58 N. Y. 217.)

And where the master has furnished such rules as may be reasonably essential to the safety of his employees, "he has discharged his duty to them in that respect, and they assume the hazard of the observance of the regulations by those with whom the duty rests to execute them." (*Tully* v. *New York & T. S. S. Co.,* 10 App. Div. 463, 42 N. Y. Supp. 29, 32.) If, by reason of a violation of such rules by the servants of the defendant,

another servant is injured, the master is not liable. (*Spangler v. Baltimore & O. R. Co.,* 213 Pa. 320, 62 Atl. 919; *Denver & R. G. R. Co.* v. *Sipes,* 23 Colo. 226, 47 Pac. 287; *Anderson* v. *Daly Min. Co.,* 16 Utah, 28, 50 Pac. 815; *Laughran* v. *Brewer,* 113 Ala. 509, 21 South. 415; *Grady* v. *Southern Ry. Co.,* 92 Fed. 491, 34 C. C. A. 494; *Denver & R. G. R. Co.* v. *Sipes,* 23 Colo. 226, 47 Pac. 287.)

There is no evidence whatsoever how the explosion occurred, and the jury should not have been permitted to speculate or conjecture as to the cause which brought it about. (*Sowers* v. *McManus, supra; Olsen* v. *Montana Ore Pur. Co.,* 35 Mont. 411, 89 Pac. 731.)

*Messrs. Maury & Templeman,* for Respondent, submitted a brief. Oral argument by *Mr. J. L. Templeman.*

A higher degree of care and vigilance is required of the master in dealing with a dangerous agency than in the ordinary affairs of life· or business, which involve little or no risk to persons or property. (*Mather* v. *Rillston,* 156 U. S. 391, 15 Sup. Ct. 464, 39 L. Ed. 464.)

This is not a case of a servant killed while aiding and abetting his master's design, but a case of a servant who was entirely guiltless in the premises. Had we even the case of the aiding and abetting servant, we doubt whether any court would feel like taking the issues from the jury, where the violation of the master's duty was so flagrant. In this connection, the following explosion cases are appropriate: *Angel* v. *Jellico Coal Co*, 115 Ky. 728, 74 S. W. 714; *Harp* v. *Cumberland T. & T. Co.* (Ky.), 80 S. W. 510; *Myrberg* v. *Baltimore S. M. & R. Co.,* 25 Wash. 364, 65 Pac. 539.

The *Kleebauer and Tuckashinsky Cases,* cited by appellant, have no application to the present case. They deal exclusively with the law relative to the keeping and storing of explosives as a nuisance, while our case has to do with the law of master and servant. Should, however, the court consider such cases in any manner applicable to this appeal, we then ask for a con-

sideration of the recent Pennsylvania case, *Derry Coal & Coke Co.* v. *Kerbaugh*, 222 Pa. 448, 71 Atl. 915.

It is only when there is no question of the primal duty of the master to have constant care to keep his servant provided with a reasonably safe place in which to work, that he can safely say: "The accident would not have happened had not my reasonable rule been broken. Its breach was the proximate cause of the accident. I had done all things to the full required of me by the law, and am therefore not responsible for the killing or maiming of one servant by another, immediately occasioned by the infraction of one of my rules." This is the theory underlying the decision in the *Sipes Case,* as well as all cases cited by the appellant in this behalf. We have yet to find a case where the breach of a rule absolved the master from a breach of any primary and absolute duty.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

This is an action for damages resulting from the death of Daniel O'Brien. The complaint, after setting forth the fact of O'Brien's death, the appointment of the plaintiff as administrator of his estate, alleges: That during the lifetime of O'Brien he had contributed to the support of his mother and other relatives; that on May 12, 1905, he was employed by the defendants Corra-Rock Island Mining Company, James Neill, and Alfred Frank as a miner and was working on the 1,500-foot level of the Corra mine; that on that day and on the 1,500-foot level, and about forty feet from where O'Brien was working by direction of the defendants, "the defendants had negligently and wrongfully stored and were keeping negligently a large and dangerous quantity of dynamite, to-wit, about five hundred (500 lbs.) pounds. That on said day, while the defendants knew that they were negligently storing and keeping the said dynamite in said large and dangerous quantity on said level in said mine, the same exploded and killed said Daniel O'Brien. That the death of the said Daniel O'Brien was caused proximately by the said defendants having thus stored negligently the

said large and dangerous quantity of dynamite.''   The complaint then alleges that during his lifetime O'Brien was a sober, industrious and frugal man, twenty-five years of age, capable of earning, and actually earning, $3.50 per day as a miner, and by reason of his death his estate and dependent relatives have been damaged in the sum of $10,000, for which amount judgment was demanded.

Apparently there was not any service of process upon defendant Neill.   The mining company and Alfred Frank filed an answer, in which the death of O'Brien, while employed by the mining company and as the result of an explosion of dynamite on the 1,500-foot level of the Corra mine, is admitted.   The answer also admits the corporate existence of the defendant company and the representative capacity of the plaintiff, but denies that O'Brien was employed by, or was in the employment of, the defendant Frank.   There is then a general denial of all the allegations of the complaint not specifically admitted or denied, and pleas of contributory negligence and assumption of risk. The allegations of these special pleas were put in issue by a reply.   The cause was tried to the court sitting with a jury.   At the conclusion of plaintiff's case the defendant Frank interposed a motion for a nonsuit as to himself, and the motion was granted.   A like motion made on behalf of the defendant mining company was overruled, and that company then introduced its evidence.   When the evidence was concluded, the defendant mining company moved the court for a directed verdict, which motion was denied.   The jury returned a verdict in favor of the plaintiff and against the defendant mining company, and from the judgment rendered thereon and entered, and from an order denying it a new trial, that defendant appealed.   The specifications of error relate to the refusal of the trial court to grant the mining company's motion for a nonsuit, its motion for a directed verdict, and its requests for certain instructions.

From the entire record certain facts are gathered—facts about which there is not any dispute, and some of which are useful only to illustrate the situation at the time of the accident.   Extensive mining operations were carried on in the Corra mine.

On the 1,200-foot level there was a powder magazine from which explosives were distributed to the different levels. At the 1,500-foot level a station had been cut, and from this a cross-cut had been run for 800 feet or more until the vein was intersected; and then from the point of intersection there was drifting on the vein east and west, and many men were employed in the work. To the east there were ten or eleven floors in the stopes, and on the fifth floor Daniel O'Brien was working as a shoveler. A month or more before the accident the defendant had constructed a sort of improvised magazine, called by the miners the "new magazine," on the sill floor in the east drift, by placing shelving upon which boxes of dynamite were stored. Caps were also distributed from the magazine on the 1,200-foot level. The dynamite and caps were taken to the different levels in the original packages—the caps in tin boxes containing about 100 caps each, the dynamite in fifty-pound wooden boxes, each containing about 100 sticks of dynamite. It was a rule in the mine that dynamite and caps were not to be stored together. Prior to the time the new magazine was placed in this east drift, it had been located at or near the station on the same level, and from 800 to 1000 feet from where the men were at work. Apparently the work on the sill floor was advanced sufficiently and this new magazine so located that O'Brien's place of work on the fifth floor was almost directly above and some forty feet from the magazine. Machine drills were employed, and five or six sticks of dynamite were placed in each hole for blasting. The day shift on the 1,500-foot level went off work at 4 o'clock in the afternoon. The machinemen working east and those working west of the point of intersection completed their drilling about 3 P. M., procured dynamite from the new magazine, and also procured fuse and caps, charged the holes by about 3:45, and blasted immediately before quitting work. At noon the men took thirty minutes for luncheon, and for some time, including the day of the accident, O'Brien and some of his fellow-workmen had eaten luncheon on the sill floor and within a few feet of this new magazine; and some of these men at least knew that dynamite was kept there. On May 12, at

about 3 P. M., the machinemen had completed drilling, and some of them had come to the new magazine for explosives. At this point there is a break in the story which the record relates. Soon afterward there was a terrific explosion, and seven men, including O'Brien, were killed, four of these being in the stopes at the time. The force of the explosion was so great that mining timbers from twenty-two to twenty-four inches in diameter were broken in two, heavy T-rails were torn from the tracks and twisted out of shape, the air-pipes were destroyed, the head and limbs were torn from each of two human bodies, and the entire body of one miner literally blown to pieces. It is admitted that O'Brien was earning $3.50 per day, and there is not any dispute in the evidence that he was a strong, sober, and industrious man, twenty-five years of age, with an expectancy of life of thirty-eight and eighty-one hundredths years; that his mother, a woman of fifty-eight years of age, had a pecuniary interest in his life; and that she had an expectancy of approximately sixteen years.

In addition to such of the foregoing facts as were testified to by his witnesses, the plaintiff relied for recovery upon the evidence given by Frank D. Melville, a timberman, and Wilfred Russell, a mule driver, each employed at the 1,500-foot level at the time the explosion occurred. Melville testified that on the morning of May 12 he noticed three boxes of dynamite in the new magazine; that there were two, three, or four boxes stored there all the time—"I don't think there were ever less than three or four boxes stored there"—that on the morning of May 12 he also noticed an old powder-box containing a quantity of caps in this magazine with the dynamite; that it was the custom of the defendant company to send to the new magazine at one time dynamite in quantity sufficient for the day and night shifts; that there were four machine drills at work in the stopes east of the point of intersection of the cross-cut and vein; that he did not know how many machines were employed west of that point, but he thought more men were employed there than in the east stopes; that the powder supply in the new magazine was for the miners in the west stopes as well as those in the east stopes,

where he worked; that at noon on May 12 he ate his luncheon with O'Brien and others near this new magazine, and conditions there then appeared to him to be the same as they were in the morning when he noticed the three boxes of dynamite stored there; that he did not notice the caps at noon. "No; but they were always in there before. I suppose they were there. * * * The caps and fuse were always there. The condition existed there of keeping that dynamite with those caps in the same place from the time the magazine was moved in there, I believe." That usually after the powder-boxes were emptied of dynamite they were broken up, and, while there may have been empty boxes there on May 12, he did not believe there were any. This witness was within sixty or sixty-five feet of the new magazine at the time of the explosion, and knew the extent of the damage done by it. He also testified that in the ordinary course of O'Brien's employment he would go to his work on the upper floor by a manway, which was twenty feet or more from the new magazine, and would not pass by or nearer than twenty feet of it, and that there was not any covering over this new magazine.

Russell testified that six or seven minutes before the explosion he noticed five or six boxes of dynamite in the new magazine; that the powder and caps were kept in the same place in the new magazine; that there were two boxes of powder there all that day; that he hauled four more boxes to that magazine after noon on the day of the explosion; that during the day powder sufficient for both the day and night shifts was stored in the new magazine; that he saw some caps at the place where the powder was kept, a couple of handsful—"they generally had a couple or three boxes—200 or 300 caps"; that these caps were brought down in the original tin boxes and emptied into powder-boxes; that on the afternoon of May 12 he saw the powderman at the new magazine picking small particles of rocks from among the caps there in the old powder-box; that there was not any covering over this new magazine; that it was possible for these caps to be exploded by rocks falling upon them; that caps exploded

more easily than dynamite, and, if caps exploded near the dynamite, the latter would be exploded.

The motion for a nonsuit in favor of the defendant company is as follows: "We also move for a nonsuit as to the defendant Corra-Rock Island Company for the reason that there is no evidence sustaining the allegations of the complaint as to the proximate cause of the injury. There is no evidence here that the proximate cause of the injury was the storage or keeping of powder in a negligent or any other manner. The evidence shows that powder was kept on the 1,500-foot level, or was there at the time of the accident, and was kept there for temporary purposes to meet the requirements of the miners who were working on the levels and in the stopes."

The evidence of the mining company, so far as it tended to establish a defense or to contradict that produced by the plaintiff's witnesses, is, in substance, as follows:

Coats, who was the powderman on the 1,500-foot level at the time of the explosion, testified that just before noon on May 12 he was at the new magazine, and there were only a few sticks of dynamite there then, not as much as one full box; that two boxes were taken there about 2 o'clock in the afternoon; that the caps were kept fifty feet or more from the powder; that he did not see any caps near the powder on that day; that he never knew of caps and powder being kept together; that he did not recollect of picking particles of rock from among the caps upon the day of the explosion, and is certain that he did not do so.

Shea, who was day shift boss at the time of the explosion, testified that on that day he noticed a few boxes of powder in the new magazine; that he saw two boxes sent in there that day; that the caps were kept seventy feet away from the powder; that he never noticed caps kept with the powder; that he seldom went to the new magazine; that it was the duty of the powderman to supply powder and caps; that two boxes of powder were necessary for one round of blasts; that they never kept in the new magazine any more powder than was necessary for the immediate necessity of one shift then at work; that this new magazine was moved from its position near the station to this

east drift in order to make room for a stable, and that this new magazine was covered. On cross-examination he said: "I spoke about a magazine on the 1,200-foot level. That is the one that Coats would get the powder from. Don't know how much he would take down every day, or how often he would take it down. There was nothing in my line of duty to call my attention to that."

Barry, who was night shift-boss and worked until 2 or 2:30 A. M. of the day of the explosion, testified that there was not much powder left in the new magazine when he quit work, there might have been a few sticks, but they were generally short of powder; that the caps were kept from fifty to seventy-five feet from the powder; that he never found powder and caps together, and never knew of the rule against keeping them together having been violated in the Corra mine. He did not know anything of the conditions when the day shift went to work.

Alfred Frank, a mining engineer, who had general supervision of the work in the Corra mine at the time of the disaster, testified that he went through the workings about once a week; that he never knew of the rule against keeping powder and caps together having been violated in the Corra mine; that, if there had been such a violation, he would have noticed it; that he knew they were not kept together; that there were frequently empty powder boxes about the new magazine. In his opinion there was in fact an explosion at each of two different places, about twenty feet apart, one at the new magazine and one at the manway.

There is not any contention made that the evidence which tended to show that the caps and powder were kept together was not within the issues made by the pleadings. Counsel for appellant do not urge the admission of that evidence as error, and cannot do so, for the evidence was admitted without objection, and the complaint will now be treated as if it had been amended to admit the introduction of that evidence, and the first sentence in the motion for a nonsuit above may be disregarded. There is a substantial conflict in the evidence as to whether the powder and caps in fact were kept together; but counsel for

appellant insist that, if they were, that dangerous situation was brought about by the wrongful acts of the miners, who were fellow-servants of Daniel O'Brien.   But this contention fails by reason of the fact that the mining company did not in its answer plead the negligence of O'Brien's fellow-servants, and therefore its requested instructions Nos. 2, 5, and 9 were properly refused. In *Longpre* v. *Big Blackfoot Milling Co.*, 38 Mont. 99, 99 Pac. 131, this court said: "A like contention is made that the evidence conclusively shows that the injury was the result of the negligence of the helper, a fellow-servant.   This defense is of the same nature as that of assumption of risk.   It is based upon the principle that one entering upon the service of another assumes the ordinary risks of the employment, among which is included the risk of injuries caused by the negligence of fellow-servants.   [Citing authorities.]   It must logically follow, then, that in those jurisdictions, as in Montana, where the rule has been adopted that the defenses of contributory negligence and assumption of risk must be availed of, if at all, by special allegation, the defendant must in like manner avail himself of the defense that the negligence charged was that of a fellow-servant.   [Citing cases.]"

But it is earnestly urged that the evidence is insufficient to support the allegation of the complaint that the defendant negligently kept a large and dangerous quantity of dynamite in proximity to the place where O'Brien was required to work.   It is said that the testimony of the witness Melville upon that point is not entitled to serious consideration, for the reason that, while on direct examination he testified that he saw three boxes of dynamite in the new magazine in the morning and at noon of May 12, on cross-examination he was forced to admit that he did not examine the boxes, and, so far as he actually knew, they may have been empty.   The testimony may or may not have been entitled to very great weight; but we are not prepared to say that it does not have any evidentiary value whatever.   On his direct examination this witness said: "I saw three boxes of powder stored in that magazine on the morning before O'Brien was killed."   On cross-examination he said: "As I

went there this particular morning and hung up my bucket, I noticed three boxes of dynamite.'' And again, in answer to a question, he said: ''Yes, sir; I know that for a fact that there were three boxes of powder there that morning. There was always a kind of a certainty as to how much powder was stored there—all the way from three to four or five boxes.'' And again: ''I hung my bucket up there on the morning of the 11th of May also. I would not say how many boxes of powder were there at that time. There may have been four or five, but there was in the neighborhood of two or three or four all the time. I don't think there were ever less than three or four boxes stored there.'' Further on the witness said: ''I had no occasion to make any examination of the powder boxes that I saw piled up there on that day. I could not say how much powder was in them. The tops of the three boxes were closed, and the boxes are labeled: 'Dangerous, high explosives.' They might have been empty for all I know.'' Again, he said: ''They did not leave empty boxes in there.'' On his redirect examination he testified that the boxes did not appear to have been opened, so far as he could see. On recross-examination he again said: ''There were three boxes of dynamite there at noon.'' We think it was for the jury to determine the weight to be given to this testimony.

Next it is insisted that the evidence given by the witness Russell was hearsay. During the course of his examination he said: ''I hauled four boxes of powder that day a little after dinner. Did not put them on or take them off of the cars. We had loaders and timbers. I don't know who put the powder in. It must have been the loaders. They told me there were four boxes.'' Further on he testified: ''I did not put the four boxes in; just brought them in to the cars, and they were run in, but I don't know who took them off. All I did was to bring the powder-boxes in the cars. I knew where it was going. It was right after dinner that I took in four boxes of powder.'' On cross-examination he said: ''On the 12th of May, a little after noon. I hauled four boxes of powder to the end of the drift. * * * I got these four boxes at the station, and took them

to the magazine on the east side.'' In view of other testimony given by this witness that he saw five or six boxes of powder at the new magazine a few minutes before the explosion, that two boxes were there all that day, we cannot say that his statement that he hauled four boxes in the afternoon depended for its truth or falsity upon the veracity of the loaders; in other words, it would seem that his statement that the loaders told him there were four boxes was made by way of giving emphasis to his testimony rather than indicating the source of his knowledge.

Assuming, then, as we do, that there was some evidentiary value to the testimony of witnesses Melville and Russell, and that its weight was for the jury to determine, we are confronted with the question: Is the evidence given by these witnesses, supplemented by the facts which are not disputed, sufficient to go to the jury to prove, or tend to prove, the negligence of the defendant company? The measure of the master's liability to his servant in a case of this character is to use reasonable care to provide the servant with a reasonably safe place in which to work, due regard being had to the nature and place of the employment and the agencies actually used. (*Reino* v. *Montana Mineral Land Dev. Co.*, 38 Mont. 291, 99 Pac. 653; *Anderson* v. *Northern Pac. Ry. Co.*, 34 Mont. 181, 85 Pac. 884; *Longpre* v. *Big Blackfoot Milling Co.*, above; *Hill* v. *Nelson Coal Co.*, 40 Mont. 1, 104 Pac. 876.)

Counsel for appellant company cite *Sowers* v. *McManus*, 214 Pa. 244, 63 Atl. 601. We agree fully with the doctrine announced in that case, that: ''As the mere possession of dynamite to be used for a lawful purpose is neither unlawful nor negligent, where one is injured by the explosion of it when stored, the burden rests upon him, as in other cases of negligence, of proving either the specific act or negligence that caused the explosion, or such circumstances surrounding it as would justify the inference that the degree of care required by the law had not been observed.'' In that case it was charged that the defendant company was negligent in storing a large quantity of dynamite near the plaintiff's premises. There was but a

single witness called to support the allegaticns of plaintiff's
complaint, and, as the court says: "This witness testified to
nothing more than that dynamite had 'possibly' been kept in
a shanty; that in the morning, about two hours before the ex-
plosion, he saw a few pieces of what he supposed was dynamite
lying on the ground near a fire which an employee of the de-
fendant had built near the shanty. If dynamite had been
stored in the shanty or elsewhere, he could not say in what
quantities. In short, he did not attempt to testify that defend-
ant had any quantity of dynamite stored anywhere, and there is
nothing to show that, if the few pieces that he saw near the
fire were dynamite, their explosion was due to any negligence of
the defendant." If the facts in this case were similar to those
in the case above, we would readily agree with the Pennsylvania
court in saying as it said: "Where  *  *  *  nothing appears
but the explosion itself, there can be nothing but conjecture as
to what caused it, and against conjectured negligence no man is
called upon to defend." But we are not able to discover any
similarity in the facts of the two cases. In the present instance
the evidence tends to show that a dangerous quantity of dyna-
mite was stored within forty feet of, and immediately under,
the place where O'Brien was set to work by the defendant com-
pany, and that caps were permitted to be kept with the powder,
or that the practice of keeping them together had gone on for
such length of time that defendant company might properly be
chargeable with knowledge of it. There is not any evidence that
it was necessary or according to the custom or usage of mining
companies or individuals engaged in mining, to store powder in
such an obviously dangerous place, even though the quantity
was only sufficient for immediate use; and, in view of the evi-
dence showing the surroundings on the 1,500-foot level of the
Corra mine, and the fact that up to a month or six weeks prior
to this explosion the dynamite for immediate use had been kept
800 or 1,000 feet from where the men were working, we think
it was for the jury to say whether, under all the circumstances,
the defendant company exercised reasonable care to provide
Daniel O'Brien a reasonably safe place in which to work, con-

sidering the nature of his employment and the dangers necessarily attendant upon it.  And this view is supported by the authorities.

The case of *Tissue* v. *Baltimore & Ohio R. Co.*, 112 Pa. 91, 56 Am. Rep. 310, 3 Atl. 667, presents facts very similar to those before us.  There the railroad company had constructed a powder-house near the railroad tracks, and stored a large quantity of dynamite in it.  Tissue, a flagman employed by the railroad company, who had nothing whatever to do with the storing or use of the explosive, was killed while in the discharge of his duties near the powder-house by an explosion of the magazine.  As in this case, so in that one, the immediate cause of the explosion was not made to appear.  The court said: "As it is impossible to tell what was the immediate cause of the explosion, it would be by no means fair to charge it to the negligence of anyone."  After reciting a matter which was not considered material, the court further observes: "The inquiry is rather as to the negligence of the company in permitting so great a quantity of dynamite to be placed in such a position that an accidental explosion of it might result in death or injury to its servants"—and then proceeds to announce its conclusion in the following vigorous language: "Whilst it is true that the master does not warrant the absolute safety of those whom he employs to do his work, yet, as we held in the case of *Green & Coates Streets Passenger Ry. Co.* v. *Bresmer,* 97 Pa. 103, he is bound to take heed that he does not through his own want of care expose his servant to unnecessary risks or dangers, either from the character of the tools with which he supplies him, or the place in which he requires him to operate.  As the question growing out of what is here stated is one of fact, it can only be determined by the verdict of a jury.  Ought the company's superintendent to have known that in placing the magazine where it was placed he was exposing the men engaged in operating the road, as well as others, to a danger to which they ought not to have been exposed?  *  *  *  The act of putting the magazine where it was may have been prudent, or at least not unreasonably imprudent, and the explosion may have been

the result of an accident which no ordinary human foresight could provide against; hence, one for which no one can be held responsible. But, however this may be, the matter is, under all the evidence, for a jury, and to a jury it must be referred." We agree with this statement of the law, and for the reason therein given, which we adopt, instruction No. 8, requested by the defendant, was properly refused.

Instruction No. 3, offered by the defendant company, was also properly refused. Standing alone, the first sentence correctly states the law as declared by this court in *Olsen* v. *Montana Ore Pur. Co.*, 35 Mont. 400, 89 Pac. 731; but the vice of the instruction as a whole is found in the concluding sentence: "And, unless you are able to find the cause of such explosion without resorting to suspicion, conjectures or probabilities, your verdict must be for the defendant." Instruction No. 11, refused, is couched in similar terms. If given, these instructions would have amounted to a direction to the jury to find for the defendant company, for there was not any evidence as to the immediate cause of the explosion. The evidence does show, however, that deceased did not in any manner contribute to causing the explosion, as he was working on the fifth floor and forty feet or more from the powder. If the jury found that the defendant company was guilty of negligence in storing the powder where it was stored, and knew, or by the exercise of ordinary care ought to have known, that caps were kept with the powder, and that but for such negligence the accident would not have occurred, then, even though the negligence of a fellow-servant of O'Brien caused the explosion, the defendant company would not be entitled to escape liability. (*Meisner* v. *City of Dillon,* 29 Mont. 116, 74 Pac. 130.) And the same result would be reached if the cause of the explosion could not be attributed to the negligence of anyone; and therefore instructions Nos. 4 and 6, requested by the defendant company, were properly refused.

The court was also asked to charge the jury that if it was found from the evidence that O'Brien knew, or by the exercise of ordinary diligence might have known, that dynamite was

kept in the new magazine, then he assumed the risk incident to working at the place where he was working at the time of the explosion. This requested instruction was properly refused. It ignores the element of appreciation of the risk, which is essential to charge one with the assumption of a risk. In *Hollingsworth* v. *Davis-Daly Estates Copper Co.,* 38 Mont. 143, 99 Pac. 142, this court reiterated the rule obtaining in this state, as follows: "As the servant owes no duty to the master with regard to the place of employment, but is chargeable with the duty of performing his work, the question, in cases like this, is not whether he had equal means with the master of knowing the conditions which existed, but whether, in the light of all the surrounding circumstances, he appreciated the danger. (*Stephens* v. *Elliott,* 36 Mont. 92, 92 Pac. 45; *Forquer* v. *Slater Brick Co.,* 37 Mont. 426, 97 Pac. 843; *Hardesty* v. *Largey Lumber Co.,* 34 Mont. 151, 86 Pac. 29.)" It is to be remembered that O'Brien was not engaged in the actual work of breaking down ore, but was a shoveler. He was not accustomed to handling dynamite in this mine. His duties did not call him near the new magazine; and, while the evidence shows that he was accustomed to eating his luncheon on the sill floor near it, it does not disclose that he either knew that dynamite was kept there or that he appreciated the danger of working where he was directed to work.

Finally, it is urged that, if the company promulgated a rule against the keeping of powder and caps together, it thereby fully discharged its duty toward the employees, and O'Brien assumed the hazard of the observance of the rule by the miners, his fellow-servants, with whom rested the duty to observe and carry out the rule. Such a contention cannot be maintained, for it implies that by the mere promulgation of a reasonable rule the master may escape the consequences of his own negligence. In 1 Labatt on Master and Servant, section 210, it is said: "The test of the sufficiency of a rule is that it shall be reasonably well calculated to secure the safety of the employees *if it is faithfully obeyed.*" (Italics ours.) And again, in section 214: "An employer does not discharge his whole duty by

merely framing and promulgating proper rules for the conduct of his business, and the guidance and control of his servants. He is also under the obligation of enforcing the rules, in so far as that result can be attained by exercising a reasonably careful supervision over his business and his servants. In other words, a master's duty does not end with prescribing rules calculated to secure the safety of employees. It is equally binding on him honestly and faithfully to require their observance. * * * Whether the master was negligent in failing to enforce a rule adopted by it is a question of fact for the jury.''

In view of the evidence in this case which tends to show that for a month or more prior to the date of the explosion there was a flagrant disregard of the rule against keeping powder and caps together, for which O'Brien was not in any sense responsible, we think it was a question for the determination of the jury whether the defendant company knew, or by the exercise of reasonable care ought to have known, that the rule was not being observed; or, in other words, it was for the jury to say whether the defendant company exercised reasonable care in the promulgation and enforcement of its rule.

We do not find any error in the record. The judgment and order are affirmed.

*Affirmed.*

Mr. Chief Justice Brantly and Mr. Justice Smith concur.