ALEXANDER, ADMR., RESPONDENT, *v.* GREAT NORTHERN
RY. CO., APPELLANT.

(No. 3,574.)

(Submitted January 4, 1916.  Decided January 20, 1916.)

[154 Pac. 914.]

*Master and Servant—Railroads—Negligence—Fencing Tracks—
Federal Employers' Liability Act—Interstate Commerce—Re-
moval of Causes—Waiver—Assumption of Risk—Choice of
Ways.*

Railroads—Federal Employers' Liability Act—Interstate Commerce—What
Does not Constitute.
  1.  A conductor in charge of a work train, the particular duty of
  which train was to take cars loaded with ties to places along the line
  within the state, from where they would later be taken by other trains
  of defendant company to a tie-treating plant, also located in Montana,
  to be sent after treatment to various points upon defendant's main
  or branch lines within or without the state, *held* not to have been
  engaged in interstate commerce.

  [As to Federal Employers' Liability Act as superseding common
  and statutory law on the same subject, see note in Ann. Cas. 1915B,
  493.]

Same—Failure to Sustain Action Under Federal Act—Effect.
  2.  Failure to sustain an action under the provisions of the Federal
  Employers' Liability Act is not necessarily fatal, but recovery may
  be had under the state law if the pleadings and proof are sufficient
  under the latter.

Same—Removal of Causes—Waiver.
  3.  Where a railway company having the right to have an action
  against it removed to the federal court not only failed to assert it at
  the first opportunity, but sought a dismissal for variance as well as
  for failure on the part of plaintiff to show the breach by it of any
  legal duty, it waived such right.

Same—Duty to Fence Tracks—When.
  4.  The duty to fence railway tracks may exist, not by virtue of
  the fencing statute (Rev. Codes, sec. 4308), but because of the railway
  company's common-law obligation to exercise ordinary care to furnish
  its employees with a reasonably safe place in which to work, and
  whether it does exist depends upon the presence of circumstances which
  may render such precaution necessary.

Same—Case at Bar.
  5.  *Held,* under the above rule, that where it was known to defendant
  railway company prior to the accident that cattle abounded in the
  locality in which one of its trains was derailed in the night-time by
  reason of colliding with a cow, that they often came upon the track,
  and that collisions between them and moving trains were not unusual,
  the question whether failure to fence constituted negligence resulting
  in the death of a trainman was properly one for determination by the
  jury.

  [As to the duty of a railroad company to maintain fences and cattle-
  guards, see note in 21 Am. St. Rep. 289.]

Same—Assumption of Risk—Nonobservance of Orders.

6.  Where oral instructions claimed to have been given by defendant company to its trainmen not to run trains caboose foremost were suggestive merely or their observance was waived, the defense of assumed risk because the method pursued by the injured employee had been forbidden was not available to defendant.

Same—Choice of Ways—Assumption of Risk.

7.  Under the rule relating to assumption of risk on the part of an employee as affected by his choice of a dangerous way when a safe one or one less dangerous than the one chosen was available (*Mullery* v. *Gt. N. Ry. Co.,* 50 Mont. 408), the contention that a conductor who ran his work train at night-time, caboose instead of locomotive ahead, should have known that the greater danger of the method chosen by him was so apparent that its selection was incompatible with ordinary prudence on his part, and in selecting it was guilty of contributory negligence, *held* untenable in view of the conditions surrounding the accident.

Same—Knowledge of Working Conditions—Assumption of Risk.

8.  That decedent knew that the railway was unfenced at the point where the collision took place was not sufficient to charge him with assumption of the risk incident to colliding with cattle; to make this defense available he must have known not only that fact, and appreciated the danger from which he suffered, but also that cattle were likely to be encountered in that vicinity and that, should they be met with while the train was backing, a derailment might result and these facts he was not obliged to discover but they must have been known or plainly observable to him.

*Appeal from District Court, Flathead County; J. E. Erickson, Judge.*

ACTION by J. C. Alexander, as administrator of the estate of John P. Hall, deceased, against the Great Northern Railway Company. From a judgment in plaintiff's favor and from an order denying its motion for a new trial, defendant appeals. Affirmed.

*Messrs. Veazey & Veazey* and *Messrs. Noffsinger & Walchli,* for Appellant, submitted a brief; *Mr. I. Parker Veazey, Jr.,* argued the cause orally.

This is not a case of interstate commerce. The federal Act requires that two facts must exist before a case will come within its provisions. First, the defendant must, at the time and in the work in question, be engaged in interstate commerce, and, second, the injured party must similarly, at the time and in the work in question, be employed in such commerce. (*North Carolina R. Co.* v. *Zachary,* 232 U. S. 248, 58 L. Ed. 591, 34 Sup.

Ct. Rep. 305.)  Neither of these conditions existed in the instant case, because the ultimate use of the ties in question was not for an operating line, but for lines to be constructed, or for purposes, railroad or otherwise, afterward to be determined, and because, as a matter of fact, the deceased was not engaged in distributing or placing the finished tie, or even in manufacturing it, but only in assembling the raw material, we contend that he was even twice removed from commerce of any kind.  (*Pederson* v. *Delaware, L. & W. R. Co.*, 229 U. S. 146, 57 L. Ed. 1125, 33 Sup. Ct. Rep. 648; *Howard* v. *Illinois Cent. R. Co.*, 207 U. S. 463, 52 L. Ed. 297, 28 Sup. Ct. Rep. 141; *St. Louis etc. R. Co.* v. *Seale*, 229 U. S. 156, 57 L. Ed. 1129, 33 Sup. Ct. Rep. 651; *Bravis* v. *Chicago etc. R. Co.*, 217 Fed. 234, 133 C. C. A. 228.)

At common law there was not any duty to employees to fence a railroad track.  It has been repeatedly held in circuit courts and in federal courts of last resort, as far as cases of that character are concerned, that a failure to fence, as in this case, is not negligence, and in this result many of the judges of the supreme court of the United States took part, and no federal decision can be cited to the contrary.  (*Cowan* v. *Union Pac. R. Co.*, 35 Fed. 43; *Carper* v. *Receivers of Norfolk & Western R. Co.*, 78 Fed. 94, 35 L. R. A. 135, 23 C. C. A. 669; *Newsom's Admr.* v. *Norfolk & W. R. Co.*, 81 Fed. 133, at 135; *Gill* v. *Louisville & N. R. Co.*, 165 Fed. 438, 91 C. C. A. 613; *Nielsen* v. *Chicago, B. & Q. Ry. Co.*, 187 Fed. 393, 395, 109 C. C. A. 225; *Tillotson (Crilly)* v. *Texas & Pac. Ry. Co.*, 44 La. Ann. 95, 10 South. 400, 401; *Patton* v. *Central Iowa R. Co.*, 73 Iowa, 306, 35 N. W. 149; *Fleming* v. *St. Paul & D. R. Co.*, 27 Minn. 111, 6 N. W. 448; *Snyder* v. *Pennsylvania R. Co.*, 205 Pa. 619, 55 Atl. 778; *Ward* v. *Bonner*, 80 Tex. 168, 15 S. W. 805; *McMaster* v. *Montana Union Ry. Co.*, 12 Mont. 163, 30 Pac. 268; *Bejma* v. *Chicago, & M. Elec. Ry. Co.*, 160 Wis. 527, 149 N. W. 588, 152 N. W. 180.)

We contend that the deceased assumed the risk in two respects: (a) First, he had a choice of ways, and voluntarily,

and in disregard of instructions, chose the dangerous and forbidden way. He must then clearly have assumed the risk (3 Labatt on Master and Servant, sec. 926; *Jenney Elec. Mfg. Co.* v. *Flannery*, 53 Ind. App. 397, 98 N. E. 424) ; (b) the deceased knew and appreciated his working conditions. The law on this branch of this defense is so well settled in Montana that we content ourselves with a citation of but one authority : *Fotheringill* v. *Washoe Copper Co.,* 43 Mont. 485, 117 Pac. 86. The following authorities from other jurisdictions, not more in point or principle, hold that employees assumed the risk of an unfenced line, either as an ordinary risk or at least as a condition of which they were aware: *Tillotson (Crilly)* v. *Texas & Pac. R. Co.,* 44 La. Ann. 95, 10 South. 400; *Quill* v. *Houston etc. R. Co.,* 93 Tex. 616, 55 S. W. 1126, 57 S. W. 948; *Fleming* v. *St. Paul & D. R. Co.,* 27 Minn. 111, 6 N. W. 448; *Patton* v. *Central Iowa R. Co.,* 73 Iowa, 306, 35 N. W. 149; *Ward* v. *Bonner,* 80 Tex. 168, 15 S. W. 805; *Sweeney* v. *Central Pac. R. Co.,* 57 Cal. 15.

*Messrs. Walsh, Nolan & Scallon* and *Messrs. Logan & Child,* for Respondent, submitted a brief; *Mr. C. B. Nolan* argued the cause orally.

In *Pederson* v. *Delaware, L. & W. R. Co.,* 229 U. S. 146, 57 L. Ed. 1125, 33 Sup. Ct. Rep. 648, an iron worker, employed by the railroad company in the alteration and repair of some of the bridges near Hoboken, New Jersey, and run down and injured by an intrastate passenger train, was held to have been employed in interstate commerce. In *Zikos* v. *Oregon R. & Nav. Co.,* 179 Fed. 893, a section-hand working on the track of a railroad over which interstate and intrastate traffic is moved held employed in interstate commerce. A dining-car in constant use is, while waiting for the train to be made up for its next interstate trip, used in moving interstate traffic within the meaning of the automatic coupler law. (*Johnson* v. *Southern Pac. Co.,* 196 U. S. 1, 49 L. Ed. 363, 25 Sup. Ct. Rep. 158.) In *St. Louis etc. R. Co.* v. *Seale,* 229 U. S. 156, 57 L. Ed. 1129,

33 Sup. Ct. Rep. 651, it was held that a yard clerk while pro-
ceeding through the railway yards to meet an incoming freight
train for the purpose of taking down the numbers and initials
of the cars, etc., was employed in interstate commerce, although
the yard was a terminal for that train and none of the cars were
going to places beyond.  In the case of *Behrens* v. *Illinois Cent.
Ry. Co.,* 192 Fed. 581, a fireman on a switching engine at the
time of the injury who was handling an intrastate train was held
to be within the purview of the law.  In the case of *Colasurdo*
v. *Central R. R. of New Jersey,* 180 Fed. 832, where plaintiff,
a track-walker, was injured while assisting certain fellow-
employees in repairing a switch in a railroad yard by being
struck by cars kicked toward him, it was held that the federal law
governed.  In *Horton* v. *Oregon-Washington R. & Nav. Co.,*
72 Wash. 503, 47 L. R. A. (n. s.) 8, 130 Pac. 897, it was held
that a pumper at a pumping station for locomotives engaged
in interstate and intrastate commerce, who was furnished by the
road with a small hand-car for going the two or three miles
from his home to the station, was struck by an interstate train,
was in an employment having a substantial connection with
interstate commerce, so as to be governed by the federal Act.
In the case of *Darr* v. *Baltimore & O. R. Co.,* 197 Fed. 665, it
was held that where an engine and tender used in hauling inter-
state commerce reached the end of the run and was placed
on a fire track to await starting on a return trip, an employee
making running repairs and replacing a bolt which had been
lost from the brake-shoe of the tender was engaged in inter-
state commerce.  (See, also, *Baltimore & O. R. Co.* v. *Darr,* 204
Fed. 751, 47 L. R. A. (n. s.) 4, 124 C. C. A. 565.)  In the case
of the *Northern Pacific R. Co.* v. *Maerkl,* 198 Fed. 1, 117 C. C. A.
237, it was held that an employee working in the repair-shops
connected with an interstate track, engaged in repairing a car
used by the company indiscriminately in both interstate and
intrastate commerce, as occasion required, was engaged in inter-
state commerce.  In the case of *Montgomery* v. *Southern Pac.
Co.,* 64 Or. 597, 47 L. R. A. (n. s.) 13, 131 Pac. 507, a member of

a switching crew engaged in moving oil from an oil car to provide fuel for engines used in interstate commerce was held to be within the Federal Employers' Liability Act. In *Eng* v. *Southern Pac. Co.,* 210 Fed. 92, it was held that a person engaged in preparing a new office for a freight-shed belonging to the company and in sawing boards and nailing them in place was engaged in interstate commerce.

In the following cases railroads were held to the common-law duty to fence their tracks: *Terre Haute & I. Ry. Co.* v. *Williams,* 172 Ill. 379, 64 Am. St. Rep. 44, 50 N. E. 116; s. c., 69 Ill. App. 392, 394; *Donnegan* v. *Erhardt,* 119 N. Y. 468, 7 L. R. A. 527, 23 N. E. 1051; *Atchison T. & S. F. R. Co.* v. *Reesman,* 60 Fed. 370, 23 L. R. A. 768, 9 C. C. A. 20; *Magee* v. *North Pac. C. R. Co.,* 78 Cal. 430, 12 Am. St. Rep. 69, 21 Pac. 114; *Hayes* v. *Mich. Central Co.,* 111 U. S. 228, 28 L. Ed. 410, 4 Sup. Ct. Rep. 369; *International & G. N. R. Co.* v. *Thompson,* 34 Tex. Civ. 67, 77 S. W. 439; *Fordyce* v. *Jackson,* 56 Ark 594, 20 S. W. 528, 597.

Assumption of risk in proper use of appliances and dangerous ways: It is contended that because the caboose was in front of the train, the deceased assumed the risk of being injured as he was. The evidence shows that it was the customary thing in case of work trains to run them as this train was run at the time of the accident. The customary violation of a rule operates as a waiver of same. (Thompson on Negligence, sec. 5404.)

As sustaining this doctrine, which seems to be universally recognized, see *Duncan* v. *Atchison T. & S. F. Ry. Co.,* 86 Kan. 112, 51 L. R. A. (n. s.) 565, 119 Pac. 356; *Kenny* v. *Marquette Cement Mfg. Co.,* 243 Ill. 396, 90 N. E. 724, 727; *Cleveland, C. C. & St. L. Ry. Co.* v. *Baker,* 91 Fed. 225, 33 C. C. A. 468; *Tullis* v. *Lake Erie & W. R. Co.,* 105 Fed. 554, 44 C. C. A. 597; *St. Louis & S. F. R. Co.* v. *Arms* (Tex. Civ.), 136 S. W. 1165. We admit that greater danger attached by running the train as it was run, than if the engine was ahead. The problem under consideration, however, is not solved by saying that the former

method adopted by Mr. Hall was more dangerous than the latter method. The true test is, was the former method, even though more dangerous, a reasonably safe method? (See Thompson on Negligence, sec. 5374; *Atchison, T. & S. F. R. Co.* v. *Vincent,* 56 Kan. 344, 43 Pac. 251; *Sayward* v. *Carlson,* 1 Wash. 29, 23 Pac. 830.)

On the question of assumed risk, see, also, *O'Brien* v. *Corra-Rock Island Min. Co.,* 40 Mont. 212, 105 Pac. 724; *Gila Valley, G. & N. R. Co.* v. *Hall,* 232 U. S. 94, 58 L. Ed. 521, 34 Sup. Ct. Rep. 229; *Tuckett* v. *American Steam etc. Laundry,* 30 Utah, 273, 116 Am. St. Rep. 832, 4 L. R. A. (n. s.) 990, 84 Pac. 500; *Millen* v. *Pacific Bridge Co.,* 51 Or. 538, 95 Pac. 196; *Rummel* v. *Dilworth Porter Co.,* 131 Pa. 509, 17 Am. St. Rep. 827, 19 Atl. 345, 346; *Burnside* v. *Peterson,* 43 Colo. 382, 17 L. R. A. (n. s.) 76, 96 Pac. 256; *Terre Haute & I. Ry. Co.* v. *Williams,* 172 Ill. 379, 46 Am. St. Rep. 44, 50 N. E. 116; *Magee* v. *North Pacific C. R. Co.,* 78 Cal. 430, 12 Am. St. Rep. 69, 21 Pac. 114.

MR. JUSTICE SANNER delivered the opinion of the court.

On October 11, 1911, John P. Hall, a conductor in the service of the Great Northern Railway Company, was killed near Batavia, in Flathead county, this state, as the result of a derailment of his caboose consequent upon a collision of his train with a cow. This action, brought to recover for his death, resulted in a verdict against the company, upon which verdict judgment was duly entered. From that judgment as well as from an order denying it a new trial, the company has appealed.

A reversal is sought upon four grounds, *viz.:* (1) The complaint alleges, but the proof does not establish, that Hall was employed in interstate commerce at the time of his death; (2) no actionable negligence on the part of the appellant is alleged or proved; (3) the evidence shows a clear case of assumed risk, and (4) substantial errors of law prejudicial to the appellant, occurring at the trial.

1. The allegations of the complaint stamp the case as brought under the provisions of the Federal Employers' Liability Act, [1] and, to maintain it as such, evidence that at the time con-

cerned, the company was engaged, and the decedent was employed, in interstate commerce was indispensable. (*North Carolina R. R. Co.* v. *Zachary*, 232 U. S. 248, 58 L. Ed. 591, 34 Sup. Ct. Rep. 305.) The facts established touching this phase of the case are: The defendant company is a common carrier whose main line extends from St. Paul, Minnesota, to the Puget Sound, Washington, traversing this and other states; it owns and operates a branch line called the Marion Branch, running from its main line at Columbia Falls through Kalispell, Batavia and Kila to Marion, and from this branch a shorter branch or tributary connects Kalispell with Somers; this Marion Branch with its tributary lies wholly within Montana, but it is the source as well as the ultimate destination of both interstate and intrastate traffic. The decedent was killed while in charge of one of defendant's work trains, his particular duty with such train being to load ties from various places along the branch where they had been left by the persons who had cut the same, and to take the cars so loaded to Kalispell or leave them at Kila or other convenient siding; from such places of deposit the ties would later be taken by other trains to the defendant's tie-treating plant at Somers, whence, after treatment to increase their durability, they would be sent to various points upon the main line or branches of the appellant or its affiliated companies within or without this state as might be required for construction, renewals or repairs.

Did the work of the decedent constitute employment in interstate commerce? The answer may be found, we think, in the decisions of that great tribunal whose pronouncements are final in matters of this kind, and particularly in *Pederson* v. *Delaware, L. & W. R. Co.*, 229 U. S. 146, 57 L. Ed. 1125, 33 Sup. Ct. Rep. 648, cited by the respondent, where the following criterion is suggested: "Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be part of it? Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty

imposed upon the carrier?" Interdependence to some extent pervades all activity, and it is true, for instance, that an interstate railroad cannot perform its functions without fuel or without ties; but this does not justify the inference that persons hired by it to mine coal or to cut ties are employed in interstate commerce. (*Delaware, L. & W. R. Co.* v. *Yurkonis,* 238 U. S. 439, 59 L. Ed. 1397, 35 Sup. Ct. Rep. 902; *Bravis* v. *Chicago, M. & St. P. Ry. Co.,* 217 Fed. 234, 133 C. C. A. 228.) In the chain of events by which the standing timber should be connected with the appellant's roadbed, the decedent was one step nearer to the latter than the man who furnished the ties; but considering that the decedent had nothing to do with the ties further than to load them upon cars, leaving the cars so loaded at convenient sidings to be removed by others, that the ties so loaded were not to be marketed or used, but were to be taken to Somers and made ready for use, that no one knew when, where or how they would ultimately be used, and that so far as exigency or duty is·shown, the appellant's interstate commerce might go on unaffected whether these ties were gathered or not, the connection of his work with such commerce still appears to have been rather remote. No case has been called to our attention which in its facts closely resembles the one at bar; but in *Illinois Cent. Ry. Co.* v. *Behrens,* 233 U. S. 473, 58 L. Ed. 1051, 34 Sup. Ct. Rep. 646, Ann. Cas. 1914C, 163, it was held that employment in interstate commerce was not shown where the fireman of a switch engine operating within the city of New Orleans was killed while moving cars loaded with intrastate freight, notwithstanding that his general duties had to do with cars of all classes, often commingling those loaded with interstate freight and those empty or loaded with freight of an intrastate character, or rapidly passing from one class to the other. Accepting this as authoritative, we are impelled to the view that the decedent was not at the time of his death employed in interstate commerce, and therefore the action was not sustained under the Federal Employers' Liability Act.

It does not follow from this, however, that the appellant was or is entitled to a reversal. It is now settled that where the complaint declares under the federal law, failure to sustain it under such law is not fatal, but recovery may still be had under the state law, if the pleadings and proof are sufficient under the state law. (*Wabash R. R. Co.* v. *Hayes,* 234 U. S. 86, 58 L. Ed. 1226, 34 Sup. Ct. Rep. 729; *Jones* v. *Chesapeake, & O. Ry. Co.,* 149 Ky. 566, 149 S. W. 951.) We recall but one respect in which a defendant can be seriously prejudiced in such a situation, and that is where, by reason of diverse citizenship, removal of the cause to the federal court might be in order. In such a situation, however, the defendant must assert its right, under penalty of waiver, by filing a petition to remove at the first opportunity. (*Powers* v. *Railway Co.,* 169 U. S. 92, 42 L. Ed. 673, 18 Sup. Ct. Rep. 264; *Kansas City etc. Ry. Co.* v. *Daughtry,* 138 U. S. 298, 34 L. Ed. 963, 11 Sup. Ct. Rep. 306; *Golden* v. *Northern Pac. Ry. Co.,* 39 Mont. 435, 18 Ann. Cas. 886, 34 L. R. A. (n. s.) 1154, 104 Pac. 549; *Dempster* v. *Oregon Short Line R. R. Co.,* 37 Mont. 335, 96 Pac. 717.) This the appellant did not do; instead, and with the knowledge of its right to have the cause removed, it submitted to the jurisdiction of the state court in which the trial occurred, by seeking a dismissal for variance as well as for failure to show the breach by it of any legal duty to the decedent under either state or federal law.

2. The negligence charged in the complaint is the failure of appellant to fence its track at and near the place where Hall was killed and thus to exclude cattle, the presence of which upon the track was likely to cause derailment of its trains, and in permitting its trains to be run over said track while the same was so unfenced. The questions raised upon the pleadings and the evidence are whether under any circumstances a railway company can owe any duty to its train operatives to shield them from whatever danger the presence of cattle upon its track may cause, by fencing such track; and, if so, whether facts sufficient were made to appear in this case to establish *prima facie*

the existence of such duty. The appellant vigorously denies that any such duty ever exists, while the respondent contends that such duty may exist and in the present instance did exist—not in virtue of the fencing statute of this state (Rev. Codes, sec. 4308), which was enacted for the benefit of stock owners (*Nixon* v. *Montana etc. Ry. Co.*, 50 Mont. 95, 145 Pac. 8), but in virtue of appellant's common-law obligation to exercise ordinary care to furnish its employees with a reasonably safe place in which to work. As regards the general proposition, the authorities are by no means harmonious, but we think the better reasoning supports the respondent's position. Speaking broadly, the obligations of a railway to its employees are not different in principle from those of other masters to their servants, and when the place of work to which the servant is detailed is the track or roadway of the master, the duty to exercise reasonable diligence to keep it safe should and does arise. Indeed, little if any difficulty is found in the application of this rule where defects in the track or roadway or inanimate obstructions are involved, and we cannot see why any should arise from the mere fact that the obstruction is animate. "Unless a railway track is fenced, cattle are liable to stray upon it from adjacent fields and commons; cattle upon a railway track are liable to get run over by trains notwithstanding the vigilance of the engineer and other trainmen; engines and trains are frequently derailed by running over cattle upon the track; in such derailments trainmen are frequently killed or injured. These propositions of fact, which are abundantly borne out by the judicial reports, argue a duty upon the part of railroad companies toward their own employees of fencing their tracks so as to keep out trespassing animals." (4 Thompson on Negligence, sec. 4319.) In *Donnegan* v. *Erhardt*, 119 N. Y. 468, 7 L. R. A. 527, 23 N. E. 1051, the New York court of appeals considering the case of a trainman who had been injured through the collision of his train with a horse and whose judgment against the railroad company had been reversed by the General Term upon the ground that the only responsibility of a railroad company

for defective fences is that mentioned in the statute, and that at common law, independently of statute, a railroad company would not have been liable for injuries sustained by him said: "We think the learned General Term fell into error. A railroad company, for the safety of its passengers as well as its employees upon its engines and cars, is bound to use suitable care and skill in furnishing, not only adequate engines and cars, but also a safe and proper track and roadbed. The track must be properly laid, and the roadbed properly constructed, and reasonable prudence and care must be exercised in keeping the track free from obstructions, animate and inanimate; and if, from want of proper care, such obstructions are permitted to be or come upon the track, and a train is thereby wrecked, and any person thereon is injured, the railroad company, upon plain common-law principles, must be held responsible. Experience shows that animals may stray upon a railroad track, and that, if they do, there is danger that a train may come in collision with them and be wrecked; and adequate measures, reasonable in their nature, must be taken to guard against such danger. Independently of any statutory requirement, a jury might find upon the facts of a case that it was the duty of a railroad company to fence its track to guard against such danger." (See, also, *Dickson* v. *Omaha & St. L. Ry. Co.*, 124 Mo. 140, 46 Am. St. Rep. 429, 25 L. R. A. 320, 27 S. W. 476; *International & G. N. Ry. Co.* v. *Thompson*, 34 Tex. Civ. App. 67, 77 S. W. 439; *Fordyce et al.* v. *Jackson*, 56 Ark. 594, 20 S. W. 528; *Lackawanna etc. Ry. Co.* v. *Chenowith*, 52 Pa. St. 382, 91 Am. Dec. 168; *Sullivan* v. *Philadelphia & R. Co.*, 30 Pa. 234, 72 Am. Dec. 698.)

Nor are all the cases cited by appellant really opposed to this conclusion. Some of them are not in point, and in most of the others the judicial mind seems to have been occupied with the notion of absolute duty to fence independently of statute. To be sure, there is no such duty. Whether, in the absence of statute, a railway company ought to fence its tracks at all, and where it ought to fence, depends, so far as its employees are

concerned, upon the existence of circumstances from which it may be said that without such precautions due care has not [5] been exercised. In the present case, however, we know that cattle are permitted to run at large in this state; it is conceded that appellant's track is not and never has been fenced, and it is not disputed that fencing is the device commonly employed to effect the exclusion of cattle; there is evidence to show that some public domain exists in the neighborhood of the accident, and from it there is unobstructed access to the appellant's right of way and track, that cattle abound in the adjacent country and commonly run at large, that they frequent the vicinity of the accident, attracted by the water supply, that they often come upon the track, that encounters between them and moving trains were not unusual, that they are, potentially at least, a source of danger to such trains, and that all this was known to the appellant prior to the time of the accident. Under such conditions the failure to fence so as to keep out cattle, the consequent straying of the cow upon the track, the consequent running over the cow while on the track and the consequent derailment of decedent's train, resulting in his death, form a collection of facts which plainly constitute evidence of negligence, making a question for the determination of the jury.

3. It is contended that a case of assumed risk is shown in two respects. The first of these is "improper use of appliances or choice of ways," and it is based upon the fact that the train was backing at the time, coupled with the proposition that this is a forbidden as well as a more dangerous method of operation. [6] As to the "forbidden" feature, it will suffice to say that though Mr. Smith—a witness for appellant and one of its division superintendents—testifies that under the oral intructions given by him to the trainmasters for dissemination among trainmen, the decedent should have proceeded with the engine foremost, we fail to find any evidence of such instructions communicated to the decedent; that the imperative directions of the company to its employees touching the operation of trains are

51 Mont.—37

ALEXANDER *v.* GREAT NORTHERN RY. CO.  [Dec. T. '15

embodied in its published bulletins and rules, none of which were shown to have been contravened; that under the rules, according to Mr. Smith, "a work train has the right to run in both directions, * * * has the right to back up, with the cars in front of the engine when absolutely necessary; he has got to; you can't get away from that proposition." To this we may add that according to some of the testimony the train was being handled in the manner customary with work trains, and this, if true, tends to show that no such oral instructions existed, or that they were merely suggestive in character, or that their observance had been waived.

Whether a recovery in this case was barred by the choice of a more dangerous way is another matter and depends upon [7] circumstances which we will now proceed to consider. The decedent and his crew, having at the close of the day of October 11 loaded all their available cars, found it necessary to procure more at Kalispell; for that purpose they started eastward from Kila about 7.40 P. M.; it was then dark; the train consisted of the caboose, two outfit cars in which the crew lived, and the engine with its tender; the caboose was at the easterly end of the train and the engine was at its westerly end, pushing it toward its destination; they proceeded at the rate of ten or twelve miles an hour for some distance, until, about a mile and a quarter west of Batavia, they ran over a cow, causing the caboose to be derailed and the conductor to be killed. The argument is that a derailment was more likely from running over a cow with the caboose ahead than if the tender had been ahead and the caboose behind; that such a transposition could have been made; that had it been made, the decedent would not have been killed even if a derailment had occurred; and that since these things are so, the decedent assumed the risk, his choice of the more dangerous way having been a voluntary one. The law upon this subject is fairly well settled in this state. It is, that contributory negligence will be imputed, as a matter of law, to one who, having a duty to perform and a choice of ways to perform it, knowingly and voluntarily chooses the way which

is obviously dangerous to the way which is safe, or the way which is obviously more dangerous to that which is less so, unless his choice was justified by an emergency; but in balancing ways for the purpose of making a choice between them, the rule does not require a choice unerring in the light of after events; it requires such a choice as under all the known or obvious circumstances a reasonably prudent man might take. (*Mullery* v. *Great Northern Ry. Co.,* 50 Mont. 408, 148 Pac. 323; *Killeen* v. *Barnes-King Dev. Co.,* 46 Mont. 212, 127 Pac. 89; *Johnson* v. *Maiette,* 34 Mont. 477, 87 Pac. 447.)

If we take the appellant's evidence and measure Hall's choice of method by the light of the event, we may acknowledge that his judgment was at fault. But the true test is, how did the matter appear or how should it have appeared to Hall? The appellant concedes that the engine and tender could not have been turned so as to get the aid of the "pilot" in thrusting aside any obstructions encountered, and the asserted superiority of the tender as a forefront is based upon its weight and the presence of a foot-board nearer the track than the platform of the caboose. Mr. Smith testified that the tender without coal and with half a tank of water would weigh "about 40,000 pounds"; that the caboose would weigh "in the neighborhood of 31 or 32,000 pounds," that "the foot-board would probably strike the animal first" in case of a collision, and, though but twelve inches wide and a few inches high, "should carry almost any animal along. I don't mean to say that it would have a tendency to throw it out into the clear—that would all depend on where the animal was struck." In view of this testimony, it seems to us that instead of being obvious, the alleged superiority of the tender as a forefront was largely a matter of opinion. But be this as it may, the record is silent as to Hall's knowledge concerning the relative weight of the tender and caboose as they then stood; it is not beyond controversy that the transposition of the caboose and engine by means of a "flying-switch" was clearly a safe or a safer proceeding; it does appear, however, that a train proceeding tender foremost may be derailed by cattle, that

with the caboose ahead some lookout on the track was possible with the aid of fusees and command of the train in case an obstruction were met, could be maintained by means of the air control; that with the tender ahead, the lookout nearest the front would be in the cab, the tender's length away, aided by no head-light save a common lantern set against a reflector, and that on many previous occasions—one or more on this branch—the method employed had been pursued with safety and success. To hold, under all these circumstances, that the greater danger of the chosen method was or should have been so apparent that its selection was incompatible with ordinary prudence, is simply out of the question.

The other respect in which it is claimed that assumed risk [8] appears, is "knowledge of his working conditions" by the decedent. The argument is that for various reasons he must have known the railway was unfenced, and that his own acts and utterances establish his appreciation of the danger from such condition. That Hall knew there was no fence is a per-missible, though not a necessary, inference from the other facts in the case. The absence of the fence, however, was a passive condition—in itself harmless; and we altogether dissent from those decisions cited by appellant, which deduce assumption of risk from knowledge of that fact alone. It is as valid to say that Hall, if he knew there was no fence, may have believed that such condition was permitted by the company because in the exercise of due care it had seen no occasion to fence, as it is to say that he assumed all the risk which might arise from the concurrence of that condition with other conditions, the exist-ence of which, though known to the company, may not have been known to him. "To make a case of assumption of risk, it is not enough that the injured party knew of the thing from which harm might come; he must know and appreciate the danger from which he suffered." (*Westlake* v. *Keating G. Min. Co.,* 48 Mont. 120, 136 Pac. 38; *Osterholm* v. *Boston & Mont. etc. Co.,* 40 Mont. 508, 107 Pac. 499; *O'Brien* v. *Corra-Rock Island Min. Co.,* 40 Mont. 212, 105 Pac. 724; *McCabe* v. *Montana C. Ry.*

*Co.*, 30 Mont. 323, 76 Pac. 701.)   In connection with the want
of a fence, the presence of cattle in the adjacent country, their
ability and propensity to visit the track, the likelihood of en-
countering them, the fact that should they be encountered while
the train was backing a derailment might result, were requisite
to command a reasonable apprehension of danger; and under
the rule just stated, it does not answer to say that by exercis-
ing reasonable care the decedent could have discovered these
things.   He was not required to discover them; they must have
been known or plainly observable to him (*Moyse* v. *Northern
Pac. Ry. Co.*, 42 Mont. 272, 108 Pac. 1062) ; and as to this, the
most that can be gathered from the evidence is that such may
or may not have been the case. . We do not forget that Rae, a
witness for the appellant, testified that just before leaving Kila
he was told by the decedent to watch the air while the decedent
would ride the platform with lighted fusees looking out for stock,
and we consider that if the decedent said and did this, his ap-
prehension of danger was established.   On cross-examination,
however, the witness modified Hall's alleged statement so as to
read, "you look out for the air and I will look out for the stock,"
believing that Hall would naturally ride the platform in looking
out for stock; no one else heard this conversation; as a matter
of fact, Rae did not take charge of the air, and neither he nor
anyone else testifies that Hall went out on the platform or looked
for stock.   Moreover, this witness had within ten days of the ac-
cident made an affidavit concerning the matter, but he does not
know whether he then "said anything about this talk with Hall"
or when he first mentioned it to anyone.   These circumstances,
coupled with the inability of Hall to confirm or contradict the
witness, and with the fact that his demeanor on the stand may
have created an adverse opinion of his credibility, requires us
to say that the truth of his statement was a question for the
jury.

4. The procedural errors which it is contended require a new
trial have all been duly considered, but we do not feel that any
of them merit discussion, save the refusal of appellant's pro-

posed instruction 13. This request involved a proposition of law upon which the appellant was entitled to have the jury correctly instructed, *viz.*, the assumption of risk based upon the choice of ways. But the court cannot be put in error for refusing it, because it permits the decedent's choice of ways to be judged in the light of the event and does not indicate that the choice, to be assailable, must have been of a method obviously dangerous, or obviously more dangerous than its alternative.

Finding no reversible error in the record, the judgment and order appealed from are affirmed.

*Affirmed.*

Mr. Chief Justice Brantly and Mr. Justice Holloway concur.

Appeal taken to supreme court of the United States, January 31, 1916.

